USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3-31-17

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

MELISSA I. RAMLAKHAN,

                        **Plaintiff,**

        - against -

CAROLYN W. COLVIN,

                      **Defendant.**

**OPINION AND ORDER**

**15-CV-8129 (RLE)**

**HONORABLE RONALD L. ELLIS, U.S.M.J.:**

## I.    INTRODUCTION

Plaintiff Melissa Ramlakhan ("Ramlakhan") commenced this action under the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Ramlakhan raises two issues: (1) the Administrative Law Judge ("ALJ") failed to weigh the opinion of her treating physicians properly; and (2) the ALJ failed to consider the side effects of Ramlakhan's medications. (Doc. No. 18 (Mem. of Law in Supp. Of Pl.'s Mot. for J. on the Pleadings ("Pl. Mem.")) at 14.) On March 17, 2016, the Parties consented to the jurisdiction of the undersigned, pursuant to 28 U.S.C. § 636(c). (Doc. No. 13.)

On April 20, 2016, Ramlakhan filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, asking the Court to reverse the decision of the Commissioner and remand for further proceedings. (Doc. No. 17.) On May 17, 2016, the Commissioner cross-moved for judgment on the pleadings pursuant to Rule 12(c), asking the Court to affirm the Commissioner's decision and dismiss the Complaint. (Doc. No. 20 (Mem. of

Law in Supp. Of Def.'s Mot. for J. on the Pleadings ("Def. Mem.")) at 1.)  For the reasons set forth below, Ramlakhan's motion is **GRANTED**, the Commissioner's cross-motion is **DENIED**, and the case is **REMANDED** for further proceedings before the Social Security Administration.

## II.      BACKGROUND

### A.      Procedural History

On May 22, 2012, Ramlakhan filed for DIB and SSI benefits, alleging disability beginning on April 2, 2012.  (Tr. of Admin. Proceedings ("Tr.") at 388-401, 407.)  The Social Security Administration initially denied Ramlakhan's application on August 13, 2012.  (Tr. at 310-31.)  On September 10, 2012, Ramlakhan filed a written request for a hearing before an ALJ.  (*Id.* at 332-33.)  On September 25, 2013, Ramlakhan appeared before ALJ Mark Solomon, who adjourned the proceedings to allow Ramlakhan to get an attorney.  (*Id.* at 264-70.)  On January 28, 2014, Ramlakhan appeared with counsel for a second hearing before ALJ Soloman.  (*Id.* at 271-309.)  On March 26, 2014, ALJ Soloman found that Ramlakhan was not disabled under §§ 216(i) and 223(d) of the Social Security Act.  (*Id.* at 74-89.)  On April 2, 2014, Ramlakhan requested review of the ALJ's decision.  (*Id.* at 72-73.)  On September 25, 2015, the Appeals Council denied Ramlakhan's request for review, therefore making the ALJ's decision final.  (*Id.* at 1-4.)  Ramlakhan initiated this action on October 15, 2015.  (Doc. No. 1.)

### B.      The ALJ Hearing and Decision

#### 1.      Administrative Hearing Testimony and Other Sworn Statements

On September 25, 2013, ALJ Soloman asked a few questions before adjourning to allow Ramlakhan to get counsel.  (Tr. at 264-70.)  For example, the ALJ asked Ramlakhan about an operation that she had in May of 2013.  Ramlakhan testified that she had had arthroscopic

surgery on her left knee, and was receiving mental health treatment from her psychiatrist, Dr. Ghumman. (*Id.* at 268-69.)

When Ramlakhan returned with counsel on January 28, 2014, she testified that she was born on December 21, 1975, completed her undergraduate degree in 2003, and was last employed at Bobby Van's Steakhouse. (Tr. at 277.) In 2003, after the birth of her second child, she had a "tummy tuck" operation in order to sew back the muscles in her stomach to support her back. (*Id.* at 284.) Ramlakhan had worked full-time as a server at Bobby Van's Steakhouse from November 10, 2010, to March 29, 2012. (*Id.* at 277-78.) She had previously worked as a server at Xaviars X20 on the Hudson, as a hostess at the Blair Perrone Steakhouse, as a mail carrier for the United States Postal Service, and as a member of a prostitution ring from 1991 to 2005. (*Id.* at 280-83, 460-61.)

Ramlakhan was terminated from Bobby Van's Steakhouse because she had a verbal confrontation with another employee that had interrupted the lunch service, and that her former manager had referred to as a "meltdown." (*Id.* at 278.) Ramlakhan testified that by the time she was terminated, "[she] couldn't even lift [her] left arm anymore in the way that a person would hold trays of food." (*Id.* at 285.) Soon after, she applied for unemployment benefits, which were initially denied, but granted on appeal. *Id.* She collected unemployment benefits for the full period of 99 weeks. (*Id.* at 279.)

Ramlakhan also testified that she received substance abuse treatment for alcohol, marijuana, and pain pills during and after the time she began receiving unemployment benefits, and is currently undergoing treatment at the Albert Einstein College of Medicine ("Einstein"). (*Id.* at 279, 286.) Additionally, she testified that she uses a back brace and occasionally uses a

3

cane, and that she lives with her mother, step-father, and two children—ages twelve and eighteen. (*Id.* at 285-86.)

Ramlakhan travels by herself, but sometimes needs assistance putting on her clothes, putting together her toiletries for bathing, turning on the shower, and putting on her shoes. (Tr. at 287.) She does not do any household chores without assistance. (*Id.* at 288.) This includes cooking, cleaning, mopping, or dusting. *Id.* Ramlakhan cannot perform tasks that require the use of her hands for more than ten minutes, including washing dishes or typing. *Id.* She alternates between sitting and standing every two to five minutes because of pain. (*Id.* at 292-293.) Her back pain makes it difficult for her to concentrate on reading, writing, or accomplishing tasks. (*Id.* at 295.) To soothe her back pain, Ramlakhan will lie down once or twice per day with hot pads on her back. (*Id.* at 296.)

Ramlakhan's days are spent reminding her children of daily tasks, such as brushing teeth, taking vitamins, and reminding her younger daughter not to forget her book bag. (*Id.* at 289.) She also checks up on her ninety-nine-year-old grandmother "maybe twice a week." (*Id.* at 290.) Additionally, Ramlakhan goes to therapy at Next Steps three days a week. *Id.* Ramlakhan testified that once or twice per week she does not leave her home, and stays in her room. (*Id.* at 299.)

Ramlakhan has a panic attack at least once per day. (*Id.* at 297.) The panic attacks can be "anywhere from 10 minutes to hours," and can be triggered when remembering something in her past. *Id.* Memories that trigger panic attacks range from her pimp and girls she used to work with, to falling out of the window of her apartment complex at fifteen years old. *Id.* The latter incident occurred in 1991, when Ramlakhan attempted to flee after her stepfather argued with and strangled her. (*Id.* at 294, 449-50.) Ramlakhan plunged "at least seven stories while trying

4

to scale down the side of her building on two bed sheets draped out her window." (*Id.* at 449.)
"[S]he apparently slipped or lost grip of the sheets and fell, reportedly cracking ribs and breaking her leg and possibly suffering internal injuries." (Tr. at 450.)

Following Ramlakhan's testimony, vocational expert Dr. Gerald Belchick testified about Ramlakhan's capability to work, and what type of work she is able to do. (*Id.* at 300.) The ALJ asked Dr. Belchick about a hypothetical claimant with Ramlakhan's age, education, and work experience whose work would be limited to:

> (1) sedentary work with the ability to sit for six hours, stand or walk for up to two hours; (2) lifting and carrying up to 10 pounds occasionally and five pounds frequently; (3) no climbing of rope, ladders and scaffolds; (4) occasionally climbing of ramps and stairs; (5) occasionally balancing, stooping, kneeling, crouching, and crawling; (6) avoiding work at unprotected heights and with hazardous machinery; (7) remembering, understanding, and carrying out simply instructions; (8) maintaining attention and concentration for "rout work;" (9) maintaining a regular schedule; (10) performing a low stress job, defined as one with only simply decision making, and no close interpersonal contact with the general public.

(*Id.* 303-04.) Using the *Dictionary of Occupational Titles* ("*DOT*") [1] from the U.S. Department of Labor, Dr. Belchick testified that Ramlakhan could be a bench hand assembler, with 218,000 jobs in the national economy; surveillance system monitor, with 81,000 jobs in the national economy; or an addresser, with 196,000 jobs in the national economy. (*Id.* at 304-06.) Dr. Belchick testified that if Ramlakhan is found to be credible in her ability to stand or sit for no more than five minutes, or if claimant were to miss more than five percent of work, all of the proposed jobs would be void. (*Id.* at 307.)

---

[1] The Dictionary of Occupational Titles (DOT) was created by the Employment and Training Administration and was last updated in 1991. It is included on the Office of Administrative Law Judges (OALJ) web site because it is a standard reference in several types of cases adjudicated by the OALJ, especially in older labor-related immigration cases. www.oalj.doj.gov.

### 2.    Medical Evidence

### a.    Consulting Psychiatrist Arlene Broska, Ph.D.

On July 30, 2012, Dr. Arlene Broska, a psychologist, evaluated Ramlakhan at the ALJ's

request. (Tr. at 496-500.)  Dr. Broska found that Ramlakhan's "demeanor and responsiveness to

questions w[ere] cooperative.  Her manner of relating, social skills, and overall presentation were

adequate." (Tr. at 498.)  Ramlakhan's affect was dysphoric and her mood was dysthymic.  *Id.*

Ramlakhan's "thinking was coherent and goal directed with no evidence of hallucinations,

delusions, or paranoia in the evaluation setting."  *Id.*  Ramlakhan's insight and judgment were

poor.  (*Id.* at 499.)

Vocationally, Ramlakhan appeared to be able to "follow and understand simple directions

and instructions[, …] perform simple tasks independently[, …]  maintain attention and

concentration … [but] [s]he may not make appropriate decisions, relate adequately with others,

or appropriately deal with stress."  *Id.*  Dr. Broska diagnosed Ramlakhan with depressive

disorder, and polysubstance abuse and dependence that is in early remission.  (*Id.* at 500.)

Additionally, Dr. Broska diagnosed Ramlakhan with personality disorder, and noted her back,

shoulder, and ankle pain.  *Id.*

### b.    Consulting Examiner Marilee Mescon, M.D.

On July 30, 2012, Dr. Marilee Mescon met Ramlakhan for a consultative internal

medicine examination at the Commissioner's request. (*Id.* at 490-95.)  Ramlakhan's chief

complaints were "[l]eft knee pain; multiple trauma; left shoulder pain; [and a] history of

marijuana and alcohol abuse."  (*Id.* at 490.)  Dr. Mescon reported that the "pain scale for the left

knee goes from a 10/10 to 7/10 with analgesic medications.  She describes the pain in her left

knee as sharp and aching, sometimes the left knee gives out and has falling [sic] only once."  *Id.*

Ramlakhan described the "pain in her back as burning and sticking and pinching, on a scale of 10/10 going to 8/10 with analgesic medications." (Tr. at 490.) Additionally, Ramlakhan described the "pain in [her] left shoulder as sharp, aching, and sticking on a scale of 10/10 going to 7/10 with analgesic medications." (*Id.* at 491.)

Ramlakhan informed Dr. Mescon that she was able to shower, bathe, and dress. (*Id.* at 492.) On examination, Ramlakhan's gait and stance were normal, she could squat halfway, and she could walk on her heels and toes. (*Id.* at 492.) Ramlakhan needed no help changing for her examination or getting on and off the examination table. She was able to rise from a chair without difficulty. *Id.* In Dr. Mescon's musculoskeletal assessment, Ramlakhan's cervical spine showed full flexion.[2] (*Id.* at 493.) Dr. Mescon found full range of motion ("ROM") in Ramlakhan's elbows, forearms, wrists bilaterally, hips, and knees.[3] (*Id.* at 493-94.)

Dr. Mescon reviewed an x-ray of Ramlakhan's lumbosacral spine, which showed that Ramlakhan was "[s]tatus post surgery following a compression fracture." (*Id.* at 494-95.) Dr. Mescon's diagnosis was that Ramlakhan had left knee injury; a left shoulder injury; multiple trauma after suicidal gesture; and an old compression fracture on her back. (*Id.* at 494.) Dr.

---

[2] Dr. Mescon found that Ramlakhan's "[f]lexion and extension lumbosacral spine [is] 0 to 80 degrees, lateral flexion on the left and on the right is un[st]able, and lumbosacral rotation on the left and on the right [is] 0 to 20 degrees." Dr. Mescon found "[a]ctive [straight leg raising] SLR in the supine position on the left and on the right is 0 to 30 degrees. Active SLR in the seated position left and right is 0 to 90 degrees." In addition, "[f]orward elevation of the left shoulder 0 to 110 degrees and forward elevation of the right shoulder 0 to 150 degrees." (Tr. at 493.)
[3] Dr. Mescon found that Ramlakhan's "[f]lexion and extension left and right hip [was] 0 to 95 degrees, otherwise full ROM of hips." Dr. Mescon also found "[n]o redness, heat, swelling, or effusion," and "[Deep tendon reflexes] DTRs physiologic and equal in upper and lower extremities. There was diminished sensation over the left lateral calf down to the level of the left ankle." Ramlakhan had a 4/5 motor strength in the left upper and lower leg, as well is in the left upper and lower arm. Additionally, Ramlakhan had a 5/5 motor strength in the right upper and lower leg, and in the right upper and lower arm. Ramlakhan's hand and finger dexterity were intact, and her grip strength was "5/5 bilaterally." (Tr. at 493-94.)

Mescon's stated that her "[l]ong-term prognosis is fair to poor." *Id.* On the basis of her examination findings, Dr. Mescon stated that "there [were] no limitations in [Ramlakhan's] ability to sit, but her capacity to stand for long periods of time, climb, push, pull, or carry heavy objects would be moderately to severely limited because of all of [Ramlakhan's] medical problems." (Tr. at 494.)

### c.    Treating Psychiatrist Daniel Cohen, M.D.

On July 12, 2012, Dr. Daniel Cohen, the Medical Director at the Metropolitan Center for Mental Health, completed a mental evaluation of Ramlakhan. (*Id.* at 485-89.) Dr. Cohen noted that he had first seen Ramlakhan on April 19, 2012. (*Id.* at 485.) Dr. Cohen's treating diagnoses are post-traumatic stress disorder, generalized anxiety disorder with agoraphobia, and recurrent major depressive disorder. *Id.* Dr. Cohen noted that Ramlakhan "continues to suffer from panic attacks, restless sleep, tension, unreasonable worry, flash backs, sweating, substance abuse, impulse behavior, with a history of questionable decision making." *Id.*

Ramlakhan "presented as neat and cooperative, [and her] speech was relaxed, [and] logical, [yet] overwhelmed." (*Id.* at 487.) Ramlakhan's mood was moderately depressed and expansive. *Id.* Ramlakhan was oriented, her memory was intact, and her ability to perform calculations was appropriate. *Id.* Dr. Cohen noted "average insight, [and a] history of questionable decision making." *Id.*

Ramlakhan informed Dr. Cohen that she was "able to travel independently, do household chores, groom herself, prepare meals, and do laundry." (*Id.* at 488.) Ramlakhan told Dr. Cohen that she worked "as a waitress, and discussed having issues with her supervisors and work colleagues." *Id.* Dr. Cohen noted that suicidal features were present, and that Ramlakhan had four prior attempts, in 1992, 1999, 2002, and 2004. *Id.* Based upon the medical findings

provided in his report, Dr. Cohen found Ramlakhan was "very limited" in her ability to do work related mental activities. *Id.*

### d.    Treating Physician Sireen Gopal, M.D.

On July 9, 2013, Dr. Sireen Gopal treated Ramlakhan for back pain. (Tr. at 814-16.) Ramlakhan's gait was normal and her cardiovascular system had a regular rate and rhythm, but a palpation revealed tenderness in her bilateral lumbar facet joints and sacroiliac ("SI") joints. (*Id.* at 814.) Dr. Gopal conducted a negative bilateral SLR test, and found Ramlakhan's spine was normal. *Id.* Ramlakhan's upper and lower extremities were bilateral, and her deep tendon reflexes were bilaterally symmetrical. *Id.*

On August 9, 2013, Dr. Gopal met with Ramlakhan because Ramlakhan was having "pain while washing dishes." (*Id.* at 805.) Palpation revealed "paraspinal tenderness, moderate aggravat[ion] at end of the day." *Id.* Ramlakhan showed a decreased ROM that causes pain, lumbar instability, and a reduced motor strength of 4-/5.[4] *Id.* On August 21, 2013, Dr. Gopal met with Ramlakhan for "shooting pain down the legs." (*Id.* at 803.) Palpation revealed that there was moderate tenderness present, and Ramlakhan's back stability was fair. *Id.* On September 26, 2013, Dr. Gopal's palpation findings included tenderness of the lumbar facet joints and SI joints, but Ramlakhan's gait was normal, and the SLR test was negative bilaterally. (*Id.* at 801.) In addition, Dr. Gopal ordered a magnetic resonance imaging ("MRI") scan for Ramlakhan. (*Id.* at 802.)

---

[4] Muscle strength is graded on a scale of 0-5, with "0" representing absolutely no visible contraction and "5" being normal. Some examiners expand the scale by the addition of "+" and "-" symbols when a muscle seems to function just below or above a level. *See Motor System Examination,* DISORDERS OF THE NERVOUS SYSTEM (2008), https://www.dartmouth.edu/~dons/part_1/chapter_10.html.

On October 22, 2013, the "MRI of the lumbar spine was performed with a Philips Panorama midfield open scanner." (*Id.* at 819.) The MRI report stated that Ramlakhan's lumbar spine was "significantly limited due to [a] susceptibility artifact related to [Ramlakhan's] metallic surgical hardware. There is mild levoscoliosis of the lumbar spine. There is [a] mild chronic compression fracture involving the L2 vertebreal body. No acute compression fractures [were] seen." (Tr. at 819.)

On January 20, 2014, Dr. Gopal submitted a medical source statement. (*Id.* at 822-28.) Dr. Gopal noted that Ramlakhan was diagnosed with "lumbar radiculopathy, lumbosacral arthritis, postlaminect synd/lumbar, sacroilitis, and unspecified myalgia and myositis." (*Id.* at 822.) Dr. Gopal noted Ramlakhan's pain is located in her "mid to low back, radiating into bilateral buttocks and hips, and into the front of the bilateral thighs." *Id.* Ramlakhan's symptoms were described as a constant "cramping, sharp, [and] aching" pain. *Id.* Dr. Gopal marked down that depression and anxiety affect Ramlakhan's pain, and that she had a "marked limitation" in her ability to deal with work stress. *Id.* Dr. Gopal also noted that Ramlakhan is constantly experiencing "pain severe enough to interfere with attention and concentration." *Id.*

Dr. Gopal opined that Ramlakhan could sit for a maximum of fifteen continuous minutes at a time, and for a total of one hour during an eight hour day. (*Id.* at 823-24.) Dr. Gopal wrote that Ramlakhan could stand or walk for a maximum of fifteen continuous minutes at a time, but did not specify the total amount of time allowable during an eight hour workday. (*Id.* at 824-25.) Dr. Gopal also noted that Ramlakhan would need to lie down or recline for a total of one hour during the workday. (*Id.* at 825.) Dr. Gopal opined that Ramlakhan could occasionally lift up to ten pounds, but never more than that. (*Id.* at 826.) Ramlakhan could occasionally balance, rotate

her neck, repetitively use her hands, but she could never stoop.[5]  (*Id.* at 826-27.)  Dr. Gopal estimated that on average Ramlakhan would be absent from work "more than 3 times a month." (*Id.* at 828.)

### h.    Diagnostic Radiologist John Lyons, M.D.

On June 11, 2012, Dr. Lewis Wolstein referred Ramlakhan to radiologist Dr. John Lyons, who assessed that she had "an approximate 17 degree hallux valgus angle compatible with mild hallux valgus deformity."  (Tr. at 518, 521.)  Additionally, Dr. Lyons noted that "[t]here are no soft tissue calcifications or erosive changes to be suspicious for gout. There is no evidence of fracture, dislocation, or periosteal reaction."  (*Id.* at 521.)

### f.    Metropolitan Center for Mental Health

On February 17, 2012, Ramlakhan began treatment with Metropolitan Center for Mental Health ("Metropolitan") for substance abuse.  (*Id.* at 530-32.)  On April 19, 2012, Carol Deutsch, a nurse practitioner in psychiatry, evaluated and diagnosed Ramlakhan with post-traumatic stress disorder; major depressive disorder, recurrent, mild; antisocial traits; and assigned her a Global Assessment of Functioning Score ("GAF")[6] of 51.  (*Id.* at 581-82.)  Nurse Deutsch recommended that Ramlakhan "be given the opportunity to work the [Metropolitan's Families and Individuals in Recovery] FAIR program," and prescribed her 50mg of Vistaril.  (*Id.* at 582.)

---

[5] Stooping was described as "bending the body downward and forward by bending the spine at the waist."  (Tr. at 826.)

[6] A Global Assessment of Functioning Score is assigned by mental health professions when assessing a patient's mental functioning. The GAF is a scale from 0 to 100 where higher scores indicate greater levels of functioning. Optimal mental health and coping capabilities are represented by scores in the 91 – 100 range. A score of 61 - 70 indicates some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning. A score of 51 - 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See* THE DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 28 U.S.C. § 309.81 (Am. Psychiatric Ass'n 4th ed.) at 34.

On May 24, 2012, Nurse Deutsch reduced Ramlakhan's dose of Vistaril to 25mg, prescribed 1mg of Risperdal, and prescribed an initial 20g of Cymbalta, to be followed by a recurring dosage of 30g. (*Id.* at 590.) On June 25, 2012, Nurse Deutsch visited with Ramlakhan, finding her mood euthymic and her sleep good, and adjusted her medication to 50g of Vistaril, 1 mg of Risperdal, 20g of Celexa, and was forced to end Cymbalta because Ramlakhan's insurance wouldn't approve it. (*Id.* at 597.) On August 10, 2012, Nurse Deutsch saw Ramlakhan and was informed that she was feeling "unmotivated and depressed," had missed group sessions, and "couldn't get out of bed." (Tr. at 612.) Nurse Deutsch adjusted Ramlakhan's medication to include 50mg of Zoloft, 0.5mg of Risperdal, and ended her prescription for Vistaril and Celexa. *Id.*

On September 6, 2012, Nurse Deutsch met Ramlakhan for the last time. (*Id.* at 617.) Ramlakhan expressed that she was sleeping poorly, too depressed, and taking her medication erratically. *Id.* Nurse Deutsch adjusted Ramlakhan's medication; she kept the 50mg of Zoloft, 0.5mg of Risperdal, and added 25mg of Hydroxyzine. *Id.* That same day, Ramlakhan informed her Certified Addiction and Substance Abuse Counselor ("CASAC") at Metropolitan's FAIR program that she would not be returning, and had obtained mental health services "closer to her residence." (*Id.* at 565-66.)

### g.    Montefiore Medical Center

Starting on January 5, 2009, Ramlakhan began treatment at Montefiore Medical Center ("Montefiore"). (*Id.* at 108.) On May 9, 2012, Ramlakhan consulted with Dr. Carol Elrington, and scored a 25 on the Patient Health Questionnaire ("PHQ-9") indicating severe depression.[7]

---

[7] The Patient Health Questionnaire is a multipurpose instrument for screening, diagnosing, monitoring, and measuring the severity of depression, incorporating DSM-IV depression diagnostic criteria with other leading major depressive symptoms into a brief self-report tool.

(*Id*. at 708.) Dr. Elrington examined Ramlakhan, noting full ROM in both shoulders, and pain in her left shoulder with flexion. (*Id*. at 709.) Dr. Elrington ordered physical therapy, and updated Ramlakhan's medication list to include 25mg of Vistaril. *Id*. On May 24, 2012, Dr. Elrington examined Ramlakhan again, noting full ROM in her knees, mild tenderness in the medial joint line of her left knee, crepitus in her right knee, mild decreased ROM in her lower back, and decreased ROM in left ankle. (Tr. at 713.) Dr. Elrington noted Ramlakhan's depression was doing better, and referred her to pain management. (*Id*. at 713-14.)

On June 25, 2012, Ramlakhan had x-rays of her dorsal and lumbosacral spine taken at Montefiore's Einstein Division. (*Id*. at 524-26, 719-20, 817.) The x-rays showed that Ramlakhan has "post-surgical fusion of the lumbar spine with placement of posterior metallic hardware" with evidence of a "compression fracture of the L2 vertebra," which were consistent with a prior examination. *Id*.

On June 26, 2012, Ramlakhan saw Dr. Elrington for left shoulder pain. (*Id*. at 721-24.) Ramlakhan stated that she usually experiences the pain when lifting, and was taking care of a toddler at the time. (*Id*. at 721.) An examination of her shoulder revealed full ROM in her left shoulder, but tenderness and pain with flexion. (*Id*. at 723.) Dr. Elrington assessed Ramlakhan's depression as improved, and listed her current medications as her lumbar corset brace, 25mg of Vistaril, 1mg of Risperdal, and 400mg of Ibuprofen. (*Id*. at 724.)

On July 20, 2012, Dr. David Marshak reviewed Ramlakhan's x-ray results and considered facet injections for her back. (*Id*. at 527.) Dr. Marshak noted that Ramlakhan would

---

The PHQ-9 scale measures from 0 to 27, a score of 10-14 is a provisional diagnosis of minor depression; a score of 15-19 is a provisional diagnosis of major depression, moderately severe; and a score higher than 20 is a provisional diagnosis of major depression, severe.

13

be unable to have physical therapy for her back because her physical therapy appointment allocation had been used for her shoulders. *Id.*

On August 10, 2012, Dr. David Gonzalez, an orthopedist, met with Ramlakhan about her left shoulder pain. (*Id.* at 726-28.) Dr. Gonzalez assessed that the "[l]eft shoulder reveal[ed] no asymmetry, no atrophy, [with] tenderness at the intercondylar, positive impingement sign, a positive Hawkins sign and pain in testing rotator cuff strength with weakness." (*Id.* at 727.) Additionally, Dr. Gonzalez observed Ramlakhan had no tenderness in the cervical spine, and that her ROM is "normal and painless." (Tr. at 727.) Dr. Gonzalez injected Ramlakhan's left shoulder with "5cc of .5% Marcaine and 40mg of Depo-Medrol." *Id.*

On August 30, 2012, Dr. Andrew Plodkowski, a radiologist, performed an MRI scan of Ramlakhan's left shoulder, which "demonstrated supraspinous tendinosis without discrete tear, [and] [m]inimal subacromial/subdeltoid bursitis." (*Id.* at 734, 820.)

On September 6, 2012, Dr. Imtiaz Ghumman met Ramlakhan for an initial outpatient clinical assessment. (*Id.* at 842-46.) Dr. Ghumman noted that Ramlakhan had a labile affect, and a depressed, anxious, and irritable mood. (*Id.* at 844.) Ramlakhan was well-groomed and cooperative, her speech was coherent and age-appropriate, her psychomotor activity was normal, her thought process was intact, and her thought content was normal, without evidence of any hallucinations or delusions. (*Id.* at 844-45.) In addition, Ramlakhan was alert and fully oriented, her memory, concentration, abstraction, and judgment were all intact, and she displayed no suicidal or homicidal ideation. (*Id.* at 845.) Dr. Ghumman diagnosed Ramlakhan with a mood disorder not otherwise specified ("NOS"), ruled out ("R/O") bipolar disorder, and assigned her a GAF score of 55. (*Id.* at 846.)

14

On October 2, 2012, Ramlakhan saw Dr. Ghumman and reported that medication was helpful, but she was still experiencing mood swings, depression, and anxiety. (*Id.* at 840.) She was not experiencing any suicidal or homicidal ideation, and she was participating in a "back-to-work" program, which included job searching and training. *Id.* On January 16, 2013, Ramlakhan reported that her symptoms were generally unchanged at her next visit to Dr. Ghumman. (*Id.* at 839.)

On December 26, 2013, Dr. Ghumann documented that Ramlakhan had experienced another alcohol and drug relapse. (*Id.* at 832.) On February 12, 2014, Dr. Ghumman noted that Ramlakhan still reported anger and mood swings, but was "relatively better," and she had "no active or passive suicidal or homicidal ideation." (Tr. at 832.)

### 3.    The Findings of ALJ Mark Solomon

On March 26, 2014, ALJ Solomon issued his decision that Ramlakhan was not disabled within the meaning of 28 U.S.C. §§ 216(i), 223(d), and 1614(a)(3)(A) of the Act, and had not been disabled since May 22, 2012, the date Ramlakhan filed for DIB and SSI benefits.[8] (*Id.* at 74.)

The ALJ followed the five-step sequential analysis required by 20 C.F.R. §§ 404.1520 and 416.920. At step one, ALJ Solomon determined that Ramlakhan had not engaged in substantial gainful activity since April 2, 2012. (*Id.* at 79.) At step two, he found that Ramlakhan had the following severe impairments: "post-surgery status for a back compression

---

[8] The period at issue runs from May 22, 2012, the date that Ramlakhan filed the application for DIB and SSI benefits to March 26, 2014, the date of the ALJ's hearing decision. *See* C.F.R. 28 U.S.C. § 416.335 (The earliest month that DIB and SSI benefits may be paid is the month after the application for benefits was filed.)

fracture, right hallux valgus deformity,[9] status post meniscus tear of the left knee, history of tendonitis and bursitis of the left shoulder, and depressive disorder and personality disorder." *Id.*

At step three, the ALJ determined that Ramlakhan did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 § C.F.R. Part 404, Subpart P, Appendix 1, and thus Ramlakhan was not presumed disabled. (*Id.* at 80.) The ALJ found that there was no medical evidence that the back compression fracture results "in [a] compromised nerve or spinal cord with evidence of nerve root compression; or spinal arachnoiditi;[10] or lumbar spinal stenosis resulting in inability to ambulate effectively." (Tr. at 80.) The ALJ found that there was no medical evidence indicating that the tendonitis and bursitis[11] "results in inability to perform fine and gross movements effectively." *Id.* The ALJ also found that there was no medical evidence indicating that the status post meniscus tear of the left knee "results in inability to ambulate effectively." *Id.* The ALJ noted that because Ramlakhan's depressive disorder and personality disorder did not cause "at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration, the 'paragraph B' criteria are not satisfied." (*Id.* at 81.) Lastly, the ALJ found that there was only a "mild hallux valgus deformity." (*Id.* at 82.)

---

[9] "A hallux valgus deformity… is when there is medial deviation of the first metatarsal and lateral deviation of the great toe (hallux). The condition can lead to painful motion of the joint and shoe wear difficulty." *Hallux Valgus*, AMERICAN ORTHOPAEDIC FOOT & ANKLE SOCIETY (June, 2015), http://www.aofas.org/PRC/conditions/Pages/Conditions/Hallux-Valgus.aspx.

[10] "Arachnoiditis describes a pain disorder caused by the inflammation of the arachnoid, one of the membranes that surround and protect the nerves of the spinal cord." *NINDS Arachnoiditis Information Page*, NATIONAL INSTITUTE OF NEUROLOGICAL DISORDERS AND STROKE (July 8, 2015), http://www.ninds.nih.gov/disorders/arachnoiditis/arachnoiditis.htm.

[11] Bursitis is a painful condition resulting from inflamed fluid-filled sacs, which provide cushion to bones, tendons, and muscles. *Bursitis*, MAYO CLINIC (August 20, 2014), http://www.mayoclinic.org/diseases-conditions/bursitis/basics/definition/con-20015102.

Step four requires that the ALJ determine whether Ramlakhan had the residual functional capacity ("RFC") to perform the requirements of her past relevant work. (*Id.* at 78.) Before conducting step four of the evaluation, the ALJ determined Ramlakhan's RFC by considering the medical evidence of Ramlakhan's severe and non-severe impairments, as well as Ramlakhan's age, education level, and past work experience. (*Id.* at 81.)

In reviewing the record, the ALJ considered Ramlakhan's reported pain "in her back, legs, and feet." (*Id.* at 82.) The ALJ considered that "[s]he also suffers from [a] mood disorder and depression." *Id.* The ALJ then determined that Ramlakhan's impairments "could reasonably be expected to cause the alleged symptoms; however, [Ramlakhan's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." *Id.*

The ALJ considered the findings of Montefiore Medical Center and New York Spine and Sport Rehabilitation Medicine. *Id.* The results of Montefiore's physical examination on May 9, 2012, "revealed full ROM of both shoulder[s] and only mild pain in the left shoulder with flexion." (Tr. at 82, 709.) New York Spine and Sport Rehabilitation indicated that Ramlakhan's "sensory and motor skills exam was normal, upper extremities' function was normal." (*Id.* at 82, 801.)

In addition, the ALJ considered multiple consultative and treating physicians. (*Id.* at 82-83.) Dr. Marilee Mescon, a consultative examiner, stated that Ramlakhan's "capacity to stand for long periods of time, climb, push, pull or carry heavy objects would be moderately to severely limited." (*Id.* at 82.) Dr. Sireen Gopal, Ramlakhan's treating physician, stated that Ramlakhan "could only sit for one hour a day." *Id.* Dr. Gopal left the section with "standing or

walking" blank.  *Id.*  In addition, Dr. Gopal's "physical exams show normal upper and lower extremity strength, normal gait and [a] negative SLR."  *Id.*

The ALJ also considered the opinion of Dr. Arlene Broska, the consultative psychiatric examiner, who diagnosed Ramlakhan with depressive disorder and personality disorder.  (*Id.* at 83, 500.)  Dr. Broska found that Ramlakhan could "maintain attention, concentrate for rote work, and perform low stress job[s]."  (*Id.* at 83.)  Lastly, the ALJ considered Dr. Daniel Cohen, Ramlakhan's treating psychiatrist, who stated that Ramlakhan "can do household chores, but has issues with supervisors and coworkers."  *Id.*  The ALJ noted that, "[a]ctual activities indicated in treatment notes, such as household chores and daily routine activities, indicate that the claimant is functioning normally mentally."  *Id.*

Additionally, the ALJ did not find Ramlakhan's allegations "fully credible, and did not further restrict [her] ability to perform work-related activities."  (*Id.* at 84.)  The ALJ noted that Ramlakhan "repeatedly testified that she could only sit for five minutes and stand for two minutes at one time. While she complained of being in pain at the hearing, she sat through the entire nearly one hour hearing without standing although [he] offered her the opportunity to stand whenever she felt she needed to."  (Tr. at 84.)  The ALJ also noted that Ramlakhan's "back injury incurred in 1991 but she worked thereafter for several years as a mail carrier until her arrest and incarceration, after which she worked as a waitress."  *Id.*

The ALJ concluded that given Ramlakhan's credibility issues, the clinical records and opinion evidence provided plenty of objective medical evidence documenting only mild physical limitations, which does not limit her ability to perform basic work related activities.  (*Id.* at 82, 84.)

At step four, the ALJ determined that Ramlakhan did not have an RFC to perform the requirements of her past relevant work. (*Id.* at 84.) At step five, the ALJ found, considering Ramlakhan's age, education, work experience, and residual functional capacity, there were a considerable number of jobs in the national economy that she would be able to perform. (*Id*; *see* 20 C.F.R. §§ 404.1569, 404.1569(a), 416.969, 416.969(a).)

## C.   Appeals Counsel Review

After the ALJ's decision issued on March 26, 2014, Ramlakhan requested a review by the Appeals Council.  On September 25, 2015, the Appeals Council denied review and the ALJ's decision became the final decision of the Commissioner.  (*Id.* at 1-4.)

## III.   DISCUSSION

## A.   Standard of Review

Upon judicial review, "[t]he of findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. §§ 405(g), 1383(c)(3).  Therefore, a reviewing court does not determine de novo whether a claimant is disabled.  *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)); *accord Mathews v. Eldridge*, 424 U.S. 319, 339 n.21 (1976) (citing 42 U.S.C. § 405(g)).  Rather, the court is limited to "two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  First, the court must determine whether the Commissioner applied the correct legal principles in reaching a decision.  42 U.S.C. § 405(g); *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999) (citing *Johnson*, 817 F.2d at 986); *accord Brault*, 683 F.3d at 447.  Second, the court must decide whether the Commissioner's decision is supported by substantial evidence in the record.  42 U.S.C. § 405(g).  If the

Commissioner's decision meets both of these requirements, the reviewing court must affirm; if not, the court may modify or reverse the Commissioner's decision, with or without remand. *Id.*

An ALJ's failure to apply the correct legal standard constitutes reversible error, provided that the failure "might have affected the disposition of the case." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)); *accord Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). This applies to an ALJ's failure to follow an applicable statutory provision, regulation, or Social Security Ruling ("SSR"). *See, e.g., Kohler*, 546 F.3d at 265 (regulation); *Schaal v. Callahan*, 933 F.Supp.85, 93 (D. Conn. 1997) (SSR). In such a case, the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), especially if deemed necessary to allow the ALJ to develop a full and fair record to explain his reasoning. *Crysler v. Astrue*, 563 F.Supp.2d 418, 428 (N.D.N.Y. 2008) (citing *Martone v. Apfel*, 70 F.Supp.2d 145, 148 (N.D.N.Y. 1999)).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault*, 683 F.3d at 447 (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)). The Supreme Court has defined substantial evidence as requiring "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord Brault*, 683 F.3d at 447-48. The substantial evidence standard means once an ALJ finds facts, a reviewing court may reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted).

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3)(H)(i).  The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which it is based."  42 U.S.C. §§ 405(b)(1).  While the ALJ's decision need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability.  *See Eriksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler v. Astrue*, 546 F.3d 260, 269 (2d Cir. 2008) (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01 Civ. 1120 (DC), 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence); *see also Zabala*, 595 F.3d at 409 (reconsideration of improperly excluded evidence typically requires remand).  Eschewing rote analysis and conclusory explanations, the ALJ must discuss the "the crucial factors in any determination . . . with sufficient specificity to enable the reviewing court to decide whether the determination is supported by substantial evidence." *Calzada v. Astrue*, 753 F.Supp.2d 250, 269 (S.D.N.Y. 2010) (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

**B.      Determination of Disability**

**1.      Evaluation of Disability Claims**

Under the Social Security Act, every individual considered to have a "disability" is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or

can be expected to last for a continuous period of not less than 12 months." *Id.* at §§ 416(i)(1)(A), 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505, 416.905. A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505, 416.905.

To determine whether an individual is entitled to receive disability benefits, the Commissioner is required to conduct the following five-step inquiry: (1) determine whether the claimant is currently engaged in any substantial gainful activity; (2) if not, determine whether the claimant has a "severe impairment" that significantly limits his or her ability to do basic work activities; (3) if so, determine whether the impairment is one of those listed in Appendix 1 of the regulations – if it is, the Commissioner will presume the claimant to be disabled; (4) if not, determine whether the claimant possesses the RFC to perform his past work despite the disability; and (5) if not, determine whether the claimant is capable of performing other work. 20 C.F.R. § 404.1520; *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999); *Gonzalez v. Apfel*, 61 F.Supp.2d 24, 29 (S.D.N.Y. 1999). While the claimant bears the burden of proving disability at the first four steps, the burden shifts to the Commissioner at step five to prove that the claimant is not disabled. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 123 (2d Cir. 2012).

The ALJ may find a claimant to be disabled at either step three or step five of the Evaluation. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step three, the ALJ will find that a disability exists if the claimant proves that his or her severe impairment meets or medically equals one of the impairments listed in the regulations. 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant fails to prove this, however, then the ALJ will complete the remaining steps of the Evaluation. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(5), 416.920(e), 416.945(a)(5).

A claimant's RFC is "the most [she] can still do despite [her] limitations." 20 C.F.R. §§404.1545(a), 416.945(a); *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also* S.S.R. 96-9P (clarifying that a claimant's RFC is her maximum ability to perform full-time work on a regular and continuing basis). The ALJ's assessment of a claimant's RFC must be based on "all relevant medical and other evidence," including objective medical evidence, such as x-rays and MRIs; the opinions of treating and consultative physicians; and statements by the claimant and others concerning the claimant's impairments, symptoms, physical limitations, and difficulty performing daily activities. *Genier*, 606 F.3d at 49 (citing 20 C.F.R. § 404.1545(a)(3)); *see also* 20 C.F.R. §§ 404.1512(b), 404.1528, 404.1529(a), 404.1545(b). In making the determination of whether there is any other work the claimant can perform, the Commissioner has the burden of showing that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (citation omitted).

In evaluating the claimant's alleged symptoms and functional limitations for the purposes of steps two, three, and four, the ALJ must follow a two-step process, first determining whether the claimant has a "medically determinable impairment that could reasonably be expected to produce [her alleged] symptoms." 20 C.F.R. §§ 404.1529(b), 416.929(b); *Genier*, 606 F.3d at 49. An ALJ should not consider whether the severity of an individual's alleged symptoms is supported by objective medical evidence. Social Security Ruling ("SSR") 16-3P, 2016 WL 1119029, at *3. Second, the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c); see also 20 C.F.R. § 416.929(c); *Genier*, 606 F.3d at 49.

The ALJ must consider the entire case record, including objective medical evidence, a claimant's statements about the intensity, persistence, and limiting effects of symptoms, statements and information provided by medical sources, and any other relevant evidence in the claimant's record. SSR 16-3P, 2016 WL 1119029, at *4-6. The evaluation of a claimant's subjective symptoms is not an evaluation of that person's character. *Id.*, at *1.

### 2.    The Treating Physician Rule

The SSA regulations require the Commissioner to evaluate every medical opinion received. See 20 C.F.R. § 404.1527(c); see also *Schisler v. Sullivan*, 3 F.3d 563, 567 (2d Cir. 1993). The opinion of a claimant's treating physician is generally given more weight than the opinion of a consultative or non-examining physician because the treating physician is likely "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s)." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (discussing the "treating physician rule of deference"). A treating physician's opinion is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); see also *Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir. 2015) ("SSA regulations provide a very specific process for evaluating a treating physician's opinion and instruct ALJs to give such opinions 'controlling weight' in all but a limited range of circumstances.").

If the treating physician's opinion is not given controlling weight, the Commissioner must nevertheless determine what weight to give it by considering: (1) the length, nature, and frequency of the relationship; (2) the evidence in support of the physician's opinion; (3) the consistency of the opinion with the record as a whole; (4) the specialization of the physician; and

(5) any other relevant factors brought to the attention of the ALJ that support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)(i)–(ii); *Schisler*, 3 F.3d at 567-69. The Commissioner may rely on the opinions of other physicians, even non-examining ones, but the same factors must be weighed. 20 C.F.R. § 416.927(e).

The ALJ is required to explain the weight ultimately given to the opinion of a treating physician. See 20 C.F.R. § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion"). Failure to provide "good reasons" for not crediting the opinion of a claimant's treating physician is a ground for remand. *Greek*, 802 F.3d at 375 (citing *Burgess*, 537 F.3d at 129); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."). Reasons that are conclusory fail the "good reasons" requirement. *Gunter v. Comm'r of Soc. Sec.*, 361 Fed. Appx. 197, 199-200 (2d Cir. 2012) (finding reversible error where an ALJ failed to explain his determination not to credit the treating physician's opinion). The ALJ is not permitted to arbitrarily substitute his own judgment of the medical proof for the treating physician's opinion. *Balsamo*, 142 F.3d at 81.

Furthermore, an ALJ "cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record," especially where the claimant's hearing testimony suggests that the ALJ is missing records from a treating physician. *Burgess*, 537 F.3d at 129 (quoting *Rosa*, 168 F.3d at 79); *Rosado v. Barnhart*, 290 F.Supp.2d 431, 438 (S.D.N.Y. 2003) ("[A] proper application of the treating physician rule mandates that the ALJ

assure that the claimant's medical record is comprehensive and complete."). Similarly, "if an ALJ perceives inconsistencies in a treating physician's reports, the ALJ hears an affirmative duty to seek out more information from the treating physician and to develop the administrative record accordingly." *Hartnet v. Apfel*, 21 F.Supp.2d 217, 221 (E.D.N.Y. 1998), accord *Rosa*, 168 F.3d at 79.

Finally, the ALJ must give advance notice to a *pro se* claimant of adverse findings. *Snyder v. Barnhart*, 323 F.Supp.2d 542, 545 (S.D.N.Y. 2004) (citing *Infante v. Apfel*, No. 97 Civ. 7689 (LMM), 2001 WL 536930, at *6 (S.D.N.Y. May 21, 2001)). This allows the *pro se* claimant to "produce additional medical evidence or call [her] treating physician as a witness." *Brown v. Barnhard*, 02 Civ. 4523 (SHS), 2003 WL 1888727, at *7 (S.D.N.Y. April 15, 2003) (citing *Santiago v. Schweiker*, 548 F.Supp.481, 486 (S.D.N.Y. 1981)).

### 3.     The Commissioner's Duty to Develop the Record

The ALJ generally has an affirmative obligation to develop the administrative record. 20 C.F.R. § 404.1512(d); *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) ("Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits[.]"). Under the Act, the ALJ must "make every reasonable effort to obtain from the individual's treating physician ... all medical evidence, including diagnostic tests, necessary in order to properly make" a determination of disability. 42 U.S.C. § 423(d)(5)(B). Furthermore, when the claimant is unrepresented by counsel, the ALJ "has a duty to probe scrupulously and conscientiously into and explore all relevant facts . . . and to ensure that the record is adequate to support his decision." *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999), citing *Dechirico v. Callahan*, 134 F.3d 1177, 1183 (2d Cir. 1998); *Rosa v. Callahan*, 168 F.3d 72, 82-83 (2d Cir. 1999); *Pratts v.*

*Chater*, 94 F.3d 34, 37-38 (2d Cir. 1996).  Remand to the Commissioner is appropriate when there are "obvious gaps" in the record and the ALJ has failed to seek out additional information to fill those gaps. *See Lopez v. Comm'r of Soc. Sec.*, 622 Fed. Appx. 59 (2d Cir. N.Y. 2015), citing *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999).

**C.**     **Issues on Appeal**

On appeal, Ramlakhan alleges that ALJ Solomon erred when he (1) failed to properly assess the opinion of the treating physicians; and (2) failed to consider the side effects of Ramlakhan's medications. (Pl. Mem. at 14.)   Ramlakhan argues that these errors and the Appeals Counsel's failure to consider new evidence, warrant remand to the agency for further proceedings. *(Id.* at 1-14.) The Commissioner maintains that the ALJ applied the correct legal principles in reaching his decision and that the decision is supported by substantial evidence. (Def. Mem. at 1.)

**1.**     **The ALJ Improperly Weighed The Treating Physician Evidence**

ALJ Soloman failed to properly apply the treating physician rule when he assigned the opinions of Ramlakhan's treating physician and psychiatrist "little weight."  In reviewing the record, the ALJ considered the findings of Montefiore Medical Center and New York Spine and Sport Rehabilitation Medicine. (Tr. at 82.) In addition, the ALJ gave "considerable weight" to the opinion of Dr. Marilee Mescon, a consultative examiner, who stated that Ramlakhan did not have any limitations sitting. *Id.* Dr. Mescon, however, also noted that Ramlakhan's capacity to stand for long periods of time, climb, push, pull or carry heavy objects would be moderately to severely limited. *Id.* The ALJ next considered the opinion of Dr. Sireen Gopal, Ramlakhan's treating physician, who stated that Ramlakhan could only sit for one hour a day. *Id.* The ALJ

gave "little weight to the medical opinion of Dr. Gopal since the physical exams show normal upper and lower extremity strength, normal gait and negative SLR." *Id.*

The ALJ also considered the opinion of Dr. Arlene Broska, the consultative psychiatric examiner, who diagnosed Ramlakhan with depressive disorder and personality disorder. (*Id.* at 83.) The ALJ gave Dr. Broska's opinions "partial weight" in finding that Ramlakhan "can maintain attention and concentrate for rote work and perform a low stress job." *Id.*

Lastly, the ALJ considered the opinion of Dr. Daniel Cohen, Ramlakhan's treating psychiatrist, who stated that the claimant could do household chores, but has issues with supervisors and co-workers. *Id.* The ALJ did not comment on Dr. Cohen's diagnosis of post-traumatic stress disorder, generalized anxiety disorder with agoraphobia, and recurrent major depressive disorder. (*Id.* at 485.) In addition, the ALJ did not note that Dr. Cohen found Ramlakhan "very limited" in her ability to do work-related mental activities. (*Id.* at 488.) The ALJ gave "little weight to the medical opinion of Dr. Cohen since the doctor did not specify any functional limits." (Tr. at 83.)

Though the ALJ considered the opinions of four different physicians, he based his conclusions largely on the findings of the one-time consultative physician, Dr. Mescon, whose opinion he assigned "considerable weight." The ALJ stated that Dr. Mescon's opinion "reflects the claimant's actual level of physical functioning" as the only justification for the weight assigned to Dr. Mescon. (*Id.* at 82.)

The Second Circuit has consistently refused to uphold an ALJ's decision to reject a treating physician's diagnosis because other examiners reported dissimilar findings. *See Rosa*, 168 F.3d at 81 (rejecting the Commissioner's reliance on the consulting physicians' opinions merely because they were inconsistent with those of the treating physician, and did not identify

28

any serious impairments); *Carroll v. Sec. of Health and Human Services*, 705 F.2d 638, 643 (2d Cir. 1983) (holding that it was improper for the ALJ to disregard the finding of the treating physician because the three remaining doctors who examined the claimant reached different conclusions); *see also Sobolewski v. Apfel*, 985 F.Supp.300, 314 (E.D.N.Y. 1999) (The Commissioner's burden "to offer positive evidence that plaintiff can … work … is not carried merely by pointing to evidence that is consistent with his otherwise unsupported assertion.").

It is particularly problematic for an ALJ to rely on such an opinion where, as here, the claimant's symptoms fluctuate. *See Crespo v. Apfel*, 97-CV-4777 (MGC), 1999 WL 14483, at *7 (S.D.N.Y. Mar. 17, 1999) ("In making a substantial evidence evaluation, a consulting physician's opinion or report should be given limited weight" because they are "often brief, are generally performed without benefit or review of the claimant's medical history and, at best, only give a glimpse of the claimant on a single day.").

Because the ALJ heavily relied on and assigned "great weight" to Dr. Mescon's opinion, while ignoring much of what Ramlakhan's treating physicians opined, the ALJ improperly weighed evidence. Accordingly, the Court finds that remand to the Commissioner is warranted for proper application of the treating physician rule to the opinions of Ramlakhan's treating physicians.

### 2. ALJ'S Finding that Ramlakhan is Able to Work Is Not Supported by Substantial Evidence

Before conducting step four of the evaluation, the ALJ determined Ramlakhan's RFC by considering the medical evidence of Ramlakhan's severe and non-severe impairments, as well as Ramlakhan's age, education level, and past work experience. (Tr. at 81.) The ALJ used a two-step analysis to determine all of Ramlakhan's symptoms. *Id.* First, the ALJ determined whether there was an underlying medically determinable physical or mental impairment that could be

29

shown by medically acceptable clinical and laboratory diagnostic techniques, and that could reasonably be expected to produce Ramlakhan's symptoms. *Id.* Second, the ALJ evaluated the intensity, persistence, and limiting effects of Ramlakhan's symptoms to determine how they limited her functioning. (*Id.* at 81-82.) For this evaluation, where evidence was provided in the form of statements and opinions, the ALJ evaluated the credibility of such statements based on a consideration of the case record. (*Id.* at 82.)

The ALJ ultimately found that Ramlakhan had the RFC "to perform a wide range of sedentary work." (*Id.* at 81.) The ALJ stated that Ramlakhan was capable of siting for six hours, standing or walking for up to two hours, and lifting or carrying five to ten pounds occasionally to frequently. *Id.* In addition, the ALJ stated that Ramlakhan could "maintain attention and concentration for rote work, and maintain a regular schedule and perform a low stress job defined as one with simple decision making and no close interpersonal contact with the general public." (Tr. at 81.) After finding Ramlakhan's RFC, the ALJ determined, at step four, that Ramlakhan did not have a RFC to perform the requirements of her past relevant work. (*Id.* at 84.)

In this case, the ALJ failed to meet the burden that shifts to him in step five of the analysis. *See Gonzalez*, 61 F.Supp.2d at 29. At step five, the ALJ must determine whether Ramlakhan is able to do any other work considering her RFC. In order to support a finding that an individual is not disabled at step five, the ALJ is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that Ramlakhan could do. The ALJ did not have substantial evidence to justify his determination that Ramlakhan retained the RFC to work, and committed error in concluding that Ramlakhan's

"physical and mental impairments do not significantly limit [her] ability to perform basic work related activities." (Tr. at 84.)

While the Court recognizes the ALJ's use of a vocational expert, the testimony that was credited by the ALJ is not supported by the evidence in the record. *See McIntyre v. Colvin*, 758 F.3d 148 (2d Cir. 2014) (finding that the ALJ reasonably credited the testimony of the vocational expert which was not undermined by an evidence in the record, and which was given on the basis of the expert's professional experience and clinical judgment); *Chavez v. Astrue*, 699 F.Supp.2d 1125, 1137 (C.D. Cal. 2009) ("[H]ypothetical questions to a vocational expert must consider all of the claimant's limitations").

The ALJ posited hypotheticals based on Ramlakhan's exertional and non-exertional limitations, and specifically inquired about jobs that would require low to no contact with the general public, co-workers, and supervisors. (Tr. at 304-05.) The ALJ, however, ignored the vocational expert's finding that if an individual could "only sit or stand for no more than five minutes each" she would not be able to do any of the mentioned jobs. (Tr. at 307.) In addition, the ALJ ignored the vocational expert's finding that if Ramlakhan "would be off task more than five percent of the time or she would be expected to miss more than one day per month" she would not be able to do any of the stated jobs.[12] *Id.* Instead, the ALJ relied solely on the vocational expert's findings of the type of jobs that an individual could do ignoring these limitations, as well as Dr. Gopal's estimate, that on average, Ramlakhan would be absent from work "more than 3 times a month." (*Id.* at 828.)

---

[12] The Court notes that it is unclear that the ALJ considered the interplay between Ramlakhan's physical and mental impairments, and did not adequately use the vocational expert to address this issue.

In his evaluation, the ALJ found Ramlakhan's statements concerning the intensity, persistence and effects of her symptoms not credible. (*Id.* at 82, 84.) Specifically, the ALJ found Ramlakhan not credible because she sat for nearly an hour at the hearing without taking the opportunity to stand even though she had claimed that she was unable to sit for longer than five minutes. (*Id.* at 84.) The ALJ also noted that Ramlakhan continued to work for several years after her back injury in 1991. *Id.*

Based on the record before the Court, the ALJ's reliance and misuse of the vocational expert, and his decision to reject many of the statements made by Ramlakhan and her treating physicians, the ALJ's decision cannot be upheld.

**D.    Remedy**

Under 42 U.S.C. § 405(g), the district court has the power to affirm, modify, or reverse the ALJ's decision with or without remanding for a rehearing. Remand for further administrative proceedings is appropriate if "the ALJ has applied an improper legal standard," *Rosa*, 168 F.2d at 82-83, or when the decision is not based on substantial evidence. 42 U.S.C. § 405(g). Moreover, where an ALJ has committed a legal error that may have affected the disposition of the case, such a failure constitutes a reversible error. *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004).

Because ALJ Solomon failed to meet his burden in showing Ramlakhan could do other work, and failed to apply the proper legal standard regarding the treating physicians rule, the court finds that the ALJ's decision was not supported by substantial evidence, and **REMANDS** for rehearing.

## IV. CONCLUSION

For the reasons set forth below, Ramlakhan's motion for judgment on the pleadings is **GRANTED**, the Commissioner's cross-motion is **DENIED**, and the case is **REMANDED** for further proceedings.  On remand, the ALJ must correctly apply the standards of 20 C.F.R. § 404.1527 when weighing the opinions of Ramlakhan's treating physicians, and correctly apply the standards of 20 C.F.R. § 404.1520 when deciding Ramlakhan's RFC.  This resolves Doc. Nos. 17 and 19.

**SO ORDERED this 31th day of March 2017.**
**New York, New York**

**The Honorable Ronald L. Ellis**
**United States Magistrate Judge**